IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:16-cr-193 |
| KHOA DANG VU HOANG, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Defendant Khoa Dang Vu Hoang is named in two counts in an eight-count second superseding indictment.[1] In these two counts, defendant is charged with (i) stalking, in violation of 18 U.S.C. § 2261A(1) and (ii) conspiracy to commit stalking, in violation of 18 U.S.C. §§ 2261A(1) and 371. Defendant filed a motion to suppress incriminating admissions he made during a two-hour custodial interview on the grounds (i) that his waiver of *Miranda*[2] rights was neither voluntary, knowing, nor intelligent, and (ii) that the interviewing officer's leading questions and references to deportation, defendant's family, and a potential prison sentence rendered his admissions involuntary even if the initial waiver was valid. Following full briefing, an evidentiary hearing, and oral argument, a bench ruling issued denying defendant's motion. This memorandum opinion records and further elucidates the reasons for this decision.

---

[1] Named in all eight counts is defendant's co-defendant, Nam Quoc Hoang ("Nam"). Because defendant's admissions at issue here implicate his co-defendant, defendant's trial has been severed from the trial of his co-defendant. *See Bruton v. United States*, 391 U.S. 123 (1968); *see also United States v. Hoang*, No. 1-16-cr-193 (E.D. Va. Feb. 10, 2017) (Order).

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

**I.**

The second superseding indictment alleges the following:

Nam began dating a woman ("the Victim") around May 2013. Nam lives in Fairfax County, Virginia, and the Victim lives in Montgomery County, Maryland. During their relationship, Nam allegedly took sexually explicit photos of the Victim with his cellphone. Nam and the Victim also allegedly used crack cocaine together. Shortly after Nam and the Victim broke up in December 2013, Nam began harassing the Victim. As part of this harassment, Nam and defendant allegedly drove to the Victim's house to stalk her. The Victim also allegedly talked to defendant about Nam and told defendant that she was afraid of Nam. In late December 2013, Nam threatened the Victim that he would spread the sexually explicit photos of her unless she paid him money.

In January 2014, defendant drove Nam to the Victim's house to stalk the Victim. After they determined the Victim was not home, Nam and defendant broke into the Victim's house and stole some of her possessions. On January 25, 2014, Nam then posted the sexually explicit photos of the Victim on Nam's Facebook page, which a number of people viewed. That same day, the Victim posted on her Facebook page that she would be going with her friends that night to a club in the District of Columbia. Nam saw the Victim's Facebook post and asked defendant to drive him to the club to watch for the Victim and stalk her. Defendant agreed to do so. Once Nam and defendant arrived at the club, they parked outside the club and waited for the Victim to emerge from the club. Nam had a handgun on his person for the purpose of harassing and frightening the Victim. When the Victim left the club and got into her car, Nam instructed defendant to follow her, which defendant did. When the Victim stopped her car at a traffic light, Nam got out of defendant's car, approached the Victim's car with his gun out, and demanded

2

that the Victim let him into her car. She complied, and Nam then forced the Victim at gunpoint to drive to Maryland. While Nam was in the Victim's car, Nam and defendant maintained contact via cellphone, and Nam directed defendant to follow the Victim to Maryland, which defendant did. Nam released the Victim in Maryland.

After the Victim identified defendant as one of the kidnappers, Montgomery County, Maryland police officers arrested him on August 5, 2016, and he was interviewed by several officers. The admissions he made during this interview are the subject of his motion to suppress. The pertinent facts relating to the interview, which are succinctly summarized below, are derived from (i) the video recording of the interview, which was conducted almost entirely in Vietnamese, (ii) the transcript of defendant's interview, which was translated into English[3] (iii) the forms used to secure defendant's waiver, and (iv) the testimony of defendant and Special Agent Hoang at the evidentiary hearing:

- Defendant was born in Vietnam and is 46 years old. He completed high school in Vietnam but has no other formal education. He is a naturalized United States citizen. By his own admission, defendant does not speak English well and reads and writes only a little English. Defendant had never been arrested before.

- After his arrest, defendant was taken to an interview room at a police station in Montgomery County, Maryland. Because of defendant's limited English proficiency, Maryland detectives called in FBI Special Agent Joseph Hoang. Special Agent Hoang grew up in the United States speaking both Vietnamese and English. FBI testing of his language skills shows that he speaks Vietnamese at a two-plus level and reads Vietnamese at a level three, which means that he is proficient.

- Special Agent Hoang was present during the entire interview, serving as both translator and as an interviewer. Maryland Detective Alyson Dupouy and Detective Sergeant

---

[3] Federal Bureau of Investigation Vietnamese Language Specialist Chris Vu translated the interview transcript from Vietnamese into English. FBI Special Agent Joseph Hoang, who served as translator during the entire interview, is an experienced translator who fluently speaks Vietnamese and English. He testified at the hearing that he reviewed the video recording and transcript and that both are accurate.

Robert Grimes also questioned defendant.  No more than two people — Special Agent
Hoang and one of the detectives — questioned defendant at any one time.

- The video recording of the interview begins at approximately 9:10 p.m.  Interview Video
Recording (Aug. 5, 2016).  Defendant was sitting alone in the room eating a snack with
one hand cuffed to a table.  Someone entered the room and gave defendant a bottle of
water.  Special Agent Hoang and Detective Dupouy entered the room at approximately
9:45 p.m.

- Special Agent Hoang testified at the hearing that defendant appeared "normal and
friendly" throughout the interview, and did not appear to be under the influence of any
drugs or alcohol.  *United States v. Hoang*, No. 1-16-cr-193 (E.D. Va. Feb. 10, 2017)
(Hr'g Tr. at 27).

- Special Agent Hoang introduced himself to defendant and informed defendant that
Special Agent Hoang spoke and understood Vietnamese.  Special Agent Hoang also
advised defendant to ask any questions defendant had.

- Immediately after introducing himself, Special Agent Hoang told defendant that "the first
thing we need to [do is] go over your rights."  *United States v. Hoang*, No. 1-16-cr-193
(E.D. Va. Feb. 6, 2017) (Interview Tr. at 3).  Special Agent Hoang asked defendant
whether defendant would prefer going over defendant's rights in Vietnamese or English,
and defendant requested Vietnamese.  Special Agent Hoang testified at the hearing that
he had previously advised suspects of their *Miranda* rights in Vietnamese on
approximately 20 to 30 occasions.

- Special Agent Hoang reviewed defendant's *Miranda* rights using the FBI's official
waiver form FD-395.17, which lists the *Miranda* rights in Vietnamese.  Special Agent
Hoang fluently translated the FBI waiver form from Vietnamese into English during the
hearing, thereby demonstrating the facility and ease with which he could translate from
Vietnamese into English.

- Special Agent Hoang explained that the FBI waiver form is titled in Vietnamese with the
phrase "[t]hese are your rights," and the form also includes a space to enter the location,
date, and time of the interview.  Hr'g Tr. at 29.  The form then states that defendant has
(1) the right to remain silent, and that anything defendant says can be used against him in
a court of law, and (2) the right to an attorney before and during the interview, and that if
defendant cannot hire an attorney then an attorney will be provided before the interview
begins.  *Id.*  The form then asks defendant if defendant agrees to speak without an
attorney.  *Id.*  Finally, next to the Vietnamese phrase for "I consent," there is a line for
defendant to sign the form and consent to questioning.  *Id.*; Gov't Ex. 4C.

- The video recording and interview transcript, which Special Agent Hoang confirmed was
accurate, show that defendant read the FBI waiver form in Vietnamese as Special Agent
Hoang explained each right in Vietnamese.  The translation of that process is as follows:

4

Special Agent Hoang:  You read [the waiver form] for me ok?
Defendant: Yes.
Special Agent Hoang:  We can read together.
Defendant: Yes.
Special Agent Hoang:  Okay.  This is an advisement of your rights.
Defendant: Yes.
Special Agent Hoang:  Ok, before we interview you, you must know about your rights, okay.
Defendant: Yes.
Special Agent Hoang:  You have the right to know of your rights, okay?
Defendant: Yes.
Special Agent Hoang:  You have the right to remain silent.  Okay?
Defendant: Yes.
Special Agent Hoang:  You have the right to know that anything that you said [sic] may be used against you in the court of law, okay?
Defendant: Yes.
Special Agent Hoang:  Okay.  You have the right to ask for counsel by a lawyer before and during the interview.
Defendant: Yes.
Special Agent Hoang:  If you do not have the ability to hire a lawyer,
Defendant: Yes.
Special Agent Hoang:  A lawyer will be appointed to [ ] help you okay?
Defendant: Yes.
Special Agent Hoang:  Here, this is what you must understand,
Defendant: Yes.
Special Agent Hoang:  Before the interview begins, if you agree to talk with us, —
Defendant: Yes.
Special Agent Hoang:  . . . and then you do not want to provide any answers later on, you may stop the interview at [any time].
Defendant: Yes.
Special Agent Hoang:  Do you understand that?
Defendant: Yes, yes.
Special Agent Hoang:  These are your rights, ok.
Defendant: Yes.
Special Agent Hoang:  You have to read this — this portion that is for you ok, okay?  You read it out loud ok.
Defendant (reading from the waiver form):  I have read this Advisory of Rights and I clearly understand my rights.
Special Agent Hoang:  Okay.
Defendant:  . . . At this time, I agree to answer questions in this interview without the presen[ce] of a lawyer.
Special Agent Hoang:  Okay, you understand completely, right?
Defendant (nodding):  Yes.
Special Agent Hoang:  Right now, do you agree to talk to . . . me — to this lady and to me?

> Defendant: Please go ahead with your questions. I am alright with whatever questions that you have, please ask me.

Interview Tr. at 3–6.

- Special Agent Hoang testified that defendant appeared to understand everything he was told. The video recording confirms that defendant appeared relaxed and cooperative while Special Agent Hoang reviewed defendant's *Miranda* rights and indeed throughout the entire interview. After reviewing his rights, defendant signed the FBI waiver form.

- After reviewing the FBI waiver form with defendant, Special Agent Hoang reviewed Montgomery County's "Advice of Rights" form with defendant. Gov't Exhibit 4B. Montgomery County's Advice of Rights form, which is written in English, lists the *Miranda* rights and an additional right under Maryland law, namely defendant's right to be taken before a judicial officer who would inform defendant of the charges against him and the penalties for each charge, provide a copy of the charges to defendant, make a pretrial custody determination, and advise defendant of his right to counsel and the right to a preliminary hearing before a judge. As the video recording and interview transcript indicates, defendant stated that he did not understand all aspects of this right. After Special Agent Hoang clarified this right, defendant stated that he understood it. Interview Tr. at 12–13.

- After Special Agent Hoang translated the Montgomery County Advice of Rights form into Vietnamese, defendant signed the form. Special Agent Hoang testified at the hearing that his review of defendant's *Miranda* rights and the Montgomery County Advice of Rights form consumed about 15 to 20 minutes.

- Defendant himself testified at the hearing that when he asked Special Agent Hoang to clarify something in Vietnamese, Special Agent Hoang did so and defendant was then able to understand fully.

- Special Agent Hoang first questioned defendant about the night he drove Nam to the club to stalk the Victim and Nam forced his way into the Victim's car. Defendant stated that Nam called defendant and asked defendant to take Nam from Virginia to the District of Columbia to see if the Victim had a boyfriend. Defendant then made incriminating statements about the kidnapping,[4] as well as the burglary that Nam committed with defendant.

---

[4] Nam is charged with a violation of 18 U.S.C. § 2261, which prohibits a person from traveling in interstate commerce "with the intent to kill, injure, harass, or intimidate a spouse, intimate partner, or dating partner, and who, in the course of or as a result of such travel or presence, commits or attempts to commit a crime of violence against that spouse, intimate partner, or dating partner." The government alleges that Nam committed a "crime of violence" under that statute by kidnapping, assaulting, and threatening the Victim by forcing his way into her car and demanding at gunpoint that she drive to Maryland.

- After discussing the kidnapping and burglary, Special Agent Hoang interviewed defendant regarding narcotics activities, as Special Agent Hoang had information that defendant was dealing drugs.

- At approximately 11:06 p.m., in the course of questioning defendant about narcotics activities, Special Agent Hoang engaged in the following conversation with defendant regarding defendant's immigration status:

  > Special Agent Hoang:  What year did you arrive in [the] United States?
  > Defendant: I came over in 2001.
  > Special Agent Hoang:  Okay.  Do you know that they can deport you back to Viet Nam?  Do you [know] that?
  > Defendant: Yes, I understand.
  > Special Agent Hoang:  You have to remember . . . whatever that you confessed to me, if you lie to me —
  > Defendant: Yes, sir.
  > Special Agent Hoang:  I have authority; there are ways to deport you back to Viet Nam, okay?
  > Defendant:  Yeah, yeah.  I —
  > Special Agent Hoang:  I know that you have children.
  > Defendant:  Yes, yes.
  > Special Agent Hoang:  And you have to find a way to take care of them, okay?
  > Defendant:  Yes, yes.

  Interview Tr. at 130–31.

- Special Agent Hoang then continued to question defendant about narcotics activities.  At approximately 11:12 p.m., Special Agent Hoang again raised the subject of deportation:
  > Special Agent Hoang:  This whole purse theft thing is nothing [in comparison to narcotics activity].  When you [are] charged with a federal crime, you're looking at at least 15 years ok.
  > Defendant:  Yes, sir.
  > Special Agent Hoang:  After you finish serving your sentence, it'll be deportation back to Vietnam.  What do you think your wife and kids will be thinking?  They won't love you anymore.
  > Defendant:  Yes, sir.
  > Special Agent Hoang:  [She'll] look for a new husband, [they'll] look[ ] for a new father.
  > Defendant:  Yes sir.
  > Special Agent Hoang:  I am just telling you the truth, okay!
  > Defendant:  Yes sir.
  > Special Agent Hoang:  That is the reason why you should tell me what it is that you know.  I have a way to help you.
  > [Defendant then asked to use the restroom.  Special Agent Hoang took defendant out of the interview room, and Detective Sergeant Grimes escorted defendant to

the restroom.  Defendant and Special Agent Hoang returned to the room, and Special Agent Hoang resumed his questioning]

Special Agent Hoang:  I was just telling it to you straight.  I have ways to help you.  All I need is the truth ok.

Defendant: Yeah.

[Special Agent Hoang re-handcuffed defendant's wrist to the table]

Special Agent Hoang:  But once you lie to me, then I will negate everything ok?  I will be charging you with all crimes.

Defendant: Yes sir.

Special Agent Hoang:  I don't care.

Defendant:  Yes sir.

Interview Tr. at 137–38.

- The video recording shows that defendant appeared calm and composed during both conversations relating to deportation.  Interview Video Recording (Aug. 5, 2016).  Significantly, the video reflects that defendant did not become agitated or express any concern at the mention of deportation, nor did he become more forthcoming and cooperative about his alleged narcotics activities after Special Agent Hoang raised the prospect of deportation.

- Special Agent Hoang testified that he did not learn that defendant is an American citizen until later in the interview.

- The interview continued for approximately another thirty minutes.  Defendant was given more food to eat.  At about 11:31 p.m., Special Agent Hoang asked defendant if defendant had ever heard about Nam posting photos of the Victim on the Internet.  Defendant replied that Nam had posted photos of the Victim on Nam's Facebook page, which in defendant's view was "a very dirty thing to do."  Interview Tr. at 159.  Defendant admitted that the Victim spoke to defendant and cried to defendant about her troubles with Nam.  Defendant further admitted that he did not repeat these conversations to Nam.

- The interview ended at approximately 11:35 p.m.

## II.

No principle of constitutional law is more familiar or well-established than that a person in custody must be given his *Miranda* rights before he can be questioned.  As the Fourth Circuit has explained, the Supreme Court in *Miranda v. Arizona*[5] "adopted prophylactic procedural rules

---

[5] 384 U.S. 436 (1996).

8

that must be followed during custodial interrogations" to protect the suspect's right against self-incrimination. *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001). There is no dispute that defendant in this case was subjected to a custodial interrogation, and as a result his statements must be suppressed unless he was properly advised of his *Miranda* rights and he voluntarily, knowingly, and intelligently waived his rights.[6] *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012); *Parker*, 262 F.3d at 419. Additionally, statements given after a valid waiver of *Miranda* rights are still subject to suppression if defendant made the statements involuntarily because of the interviewing officers' conduct. *United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002).

Defendant contends that his statements must be suppressed on the grounds (i) that his *Miranda* waiver was neither voluntary nor knowing and (ii) that even if his waiver passes constitutional muster, Special Agent Hoang's questioning tactics and references to deportation, defendant's family, and a potential prison sentence render defendant's statements involuntary. As a result, the first question presented is whether defendant validly waived his *Miranda* rights, and the second question is whether any of Special Agent Hoang's remarks in the course of the interview rendered defendant's statements involuntary.

---

[6] The use of the term "intelligent" in this part of the analysis may give rise to a misunderstanding. What the caselaw means by intelligent is that the suspect is fully aware of the consequences of his decision to abandon *Miranda* rights. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). In common parlance, however, an "intelligent" decision refers to a smart or sensible choice. *See Webster's Third New International Dictionary* 1175 (1993). But the Fifth Amendment does not require that a suspect's decision to waive his *Miranda* rights be either smart or sensible, nor does the Fifth Amendment require "that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

**A.**

Supreme Court precedent makes clear that there are "two distinct dimensions" to determining whether a defendant validly waived his *Miranda* rights: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, it is also clear that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* A waiver of *Miranda* rights is valid "[o]nly if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." *Id.* (internal quotation marks omitted). Accordingly, defendant's arguments on voluntariness — whether defendant's choice to waive his rights was coerced — and on the requisite level of comprehension — whether defendant understood the rights he was waiving — must be separately addressed.

With respect to whether defendant voluntarily waived his *Miranda* rights, the Fourth Circuit has made clear that "[c]oercive police activity is a necessary predicate to a finding that . . . a waiver of *Miranda* rights is not voluntary." *Cristobal*, 293 F.3d at 140–41. Defendant argues that Special Agent Hoang's use of the official FBI waiver form to secure defendant's waiver was coercive because the form allowed defendant to indicate only his consent to waiving his rights, but did not allow defendant to refuse consent or request an attorney. The fatal flaw in this argument is as simple as it is obvious; the form is not coercive, as defendant could simply have refused to sign the form if he did not wish to waive his rights. Indeed, a signed waiver form is not even necessary to establish a valid waiver, inasmuch as the Supreme Court has rejected the position that "explicit written waiver[s]" of *Miranda* rights are even necessary for a valid waiver.

*Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010) (stating that valid *Miranda* "waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered"). Special Agent Hoang's use of the FBI's official Vietnamese language waiver form falls far short of the "police overreaching" that is necessary to find that a "defendant's will has been overborne." *Cristobal*, 293 F.3d at 141 (internal quotation marks omitted).[7] Moreover, a review of the video recording makes unmistakably clear that defendant's decision to waive his *Miranda* rights was the product of a "free and deliberate choice." *Moran*, 475 U.S. at 421.

Because defendant's waiver of his *Miranda* rights was voluntary, the next issue is whether the waiver was knowing and intelligent. A waiver is knowing and intelligent if it was "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Cristobal*, 293 F.3d at 140 (internal quotation marks omitted). Whether defendant knowingly and voluntarily waived his rights depends on the totality of the circumstances surrounding the waiver. *Id.* at 142. Relevant circumstances include defendant's "intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of *Miranda* warnings." *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995) (internal quotation marks and brackets omitted). Defendant argues that his waiver was neither knowing nor intelligent because: (1) defendant has only a limited understanding of English and had never been arrested before, (2) Special Agent Hoang did not

---

[7] Obvious examples of coercive police behavior include subjecting the suspect to "severe physical abuse," holding the suspect "incommunicado and question[ing him] for over 36 hours without sleep or rest," giving the suspect truth serums, and threatening a wounded suspect with a loaded gun. *Cristobal*, 293 F.3d at 140 (collecting several Supreme Court cases).

adequately explain his rights, and (3) Special Agent Hoang inaccurately paraphrased some of the rights when translating them.

This argument is meritless. A careful review of the video recording and an assessment of the hearing testimony confirm that defendant, a 46-year-old naturalized American citizen who completed the twelfth grade, adequately understood his *Miranda* rights as accurately explained to him in Vietnamese. *Compare id.* (holding that a 24-year-old defendant with an I.Q. of 68 validly waived his *Miranda* rights). Furthermore, defendant's argument that his limited grasp of English renders his waiver unknowing fails for the simple reason that defendant was not Mirandized in English, but in Vietnamese. As the video recording and hearing testimony make clear, Special Agent Hoang, who speaks and reads Vietnamese and English fluently, painstakingly reviewed each of defendant's *Miranda* rights with defendant in Vietnamese using the FBI's official Vietnamese language waiver form, which defendant read as Special Agent Hoang explained his rights in Vietnamese.[8] Special Agent Hoang's thorough review of each

---

[8] The decisions defendant relies on to argue that his limited command of English invalidates his waiver are inapposite because those decisions involved defendants with limited understanding of English who were given their *Miranda* rights only in English, not their native languages, yet even in those scenarios courts found the *Miranda* waivers were still valid. *See United States v. Guay*, 108 F.3d 545, 548–50 (4th Cir. 1997) (concluding that defendants, who were French-speaking Canadians, knowingly waived their *Miranda* rights where officers Mirandized them in English after defendants indicated that they understood English, the officers confirmed that defendants understood their rights, and the officers clarified anything defendants did not understand); *United States v. Tran*, 589 F. App'x 139, 142 (4th Cir. 2015) (unpublished) (concluding that a *Miranda* waiver was knowing where defendant, a Vietnamese immigrant, received a thorough explanation of her rights in English, indicated that she understood her rights, and had professional experience in the banking industry and as a business owner); *United States v. Moreno*, 122 F. Supp. 2d 679, 681 (E.D. Va. 2000) (rejecting defendant's argument that his "poor English language skills prevented him from understanding his rights, which were read to him in English," where defendant confirmed that he understood his rights, was responsive during the interview, and stated that he did not need an interpreter at future court hearings).
Plaintiff also cites *United States v. Monreal*, in which the court concluded that a defendant with "no understanding of the English language" did not knowingly and intelligently

right also compensates for defendant's lack of any previous experience with *Miranda* warnings. Finally, defendant agreed to waive his rights immediately after Special Agent Hoang reviewed his rights, further supporting the conclusion that defendant knowingly and intelligently waived his rights. *See id.* (concluding that defendant's *Miranda* waiver was knowing and intelligent partly because he was given his *Miranda* warnings "immediately" before his waiver).

The record contradicts defendant's argument that Special Agent Hoang failed to explain fully each *Miranda* right or inaccurately paraphrased the rights. Special Agent Hoang methodically reviewed each and every *Miranda* right with defendant, asking defendant after each question if defendant understood each right, and defendant repeatedly confirmed that he understood each right. Interview Tr. at 3–6. Special Agent Hoang succeeded in "convey[ing] the general rights enumerated in *Miranda*" to defendant, which is all he was required to do. *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996). The argument that defendant did not comprehend his *Miranda* rights is belied by the fact that, when Special Agent Hoang asked defendant if defendant would speak to the agents, defendant replied: "Please go ahead with your questions. I am alright with whatever questions that you have, please ask me." Interview Tr. at 6.

Defendant's testimony and demeanor during the evidentiary hearing confirm that he understood his rights. Indeed, when defendant was asked at the hearing what he believed Special Agent Hoang meant by the right to remain silent, defendant made clear his understanding by

---

waive her *Miranda* rights despite the presence of an agent who acted as a Spanish interpreter. 602 F. Supp. 2d 719, 721, 723–24 (E.D. Va. 2008). That case is inapposite because the agent's "demeanor on the witness stand totally contradict[ed] any argument that he had the ability" to translate Spanish accurately into English because the agent "stumbled and hesitated" as he translated a Spanish Advice of Rights form into English. *Id.* at 723–24. In contrast, the video recording reflects that Special Agent Hoang did not stumble or hesitate, but instead fluently reviewed defendant's *Miranda* rights in Vietnamese, and at the hearing he further demonstrated his ability to translate fluently the FBI's Vietnamese waiver form into English.

13

answering that "[Special Agent Hoang] could ask but I don't have to answer the question." Hr'g. Tr. at 68. This response reflects that defendant adequately understood his rights, and in this respect it is important to recall that the "Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

Finally, the only allegedly inaccurate paraphrasing of his rights that defendant points to in his brief is when Special Agent Hoang explained defendant's right under the Montgomery County Advice of Rights form to appear before a judicial officer, which is not a *Miranda* right. Interview Tr. at 12. Defendant's argument in this respect is irrelevant; under the Fifth Amendment defendant was entitled only to be informed of his federal *Miranda* rights, not his Maryland rights.[9] But putting this point aside, Special Agent Hoang clarified defendant's Maryland right to appear before a judicial officer. And when Special Agent Hoang asked if defendant understood this clarification, defendant responded that he did. *Id.* It is also worth noting that defendant testified at the evidentiary hearing that whenever defendant asked Special Agent Hoang to clarify something, Special Agent Hoang did so and defendant was then able to understand. Hr'g Tr. at 64.[10]

---

[9] *See Oregon v. Hass*, 420 U.S. 714, 719 (1975) ("[A] State is free as a matter of its own law to impose greater restrictions [on] police activity than those this Court holds to be necessary upon federal constitutional standards.").

[10] The Court: "When you asked [Special Agent Hoang] to explain something in Vietnamese, did he do so?"
Defendant: Yes, he did.
The Court: And once he did so, did you then understand his Vietnamese? Defendant: Yes, I did.

In sum, all of the circumstances surrounding defendant's waiver point convincingly to the conclusion that his *Miranda* waiver was the product of a "free and deliberate choice"[11] and that he waived his *Miranda* rights with "a full awareness both of the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]." *Spring*, 479 U.S. at 573 (internal quotation marks omitted).[12]

## B.

The second issue raised by defendant's motion to suppress is whether Special Agent Hoang's questioning tactics and references to the prospect of deportation, defendant's family, and a potential prison sentence rendered defendant's statements involuntary, despite the valid *Miranda* waiver. In this respect, a "statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc) (internal quotation marks omitted). A statement is involuntary under the Due Process Clause if the statement was "extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *Id.* (internal quotation marks omitted). Although "coercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary' within the meaning of the Due Process Clause,"[13] it is important to note that the "mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a [statement] involuntary." *Braxton*, 112 F.3d at 780. Instead, the "proper

---

[11] *Moran*, 475 U.S. at 421.

[12] And it is worth repeating here that the Constitution does not require a suspect to know and understand every possible consequence of a waiver in order for the waiver to be knowing and intelligent. *See Spring*, 479 U.S. at 574.

[13] *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired" based on the totality of the circumstances surrounding the interview, including the "characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* at 780–81 (internal quotation marks omitted).

Defendant argues (1) that Special Agent Hoang's use of suggestive, leading questions was sufficiently coercive that all of defendant's statements must be suppressed and (2) that Special Agent Hoang's comments regarding deportation, defendant's family, and a potential prison sentence toward the end of the interview require suppression of an incriminating statement that followed those comments.[14] Both arguments are unpersuasive.

Defendant identifies only ten short exchanges spanning eleven pages out of a 164-page transcript that he claims are problematic because of Special Agent Hoang's allegedly leading and suggestive questioning.[15] Defendant's claim in this respect is unpersuasive. To begin with, he fails to acknowledge the dozens of open-ended questions Special Agent Hoang asked throughout the remainder of the interview. Moreover, defendant, in making this argument, relies solely on the Ninth Circuit's decision in *United States v. Preston*, in which the court considered the

---

[14] Defendant also argues that because of his upbringing in Vietnam, where police allegedly torture suspects, he was subject to unlawful coercion because he feared he would be beaten or shot if he disobeyed his interviewers. A recent decision in this district persuasively rejected this argument. In *United States v. Doan*, the defendant there argued that "because of defendant's experiences in Vietnam, defendant felt a psychological pressure to cooperate fully with law enforcement." 184 F. Supp. 3d 271, 280 (E.D. Va. 2016). As noted in *Doan*, "there is no sound legal basis for the argument that a psychological pressure rooted in an individual's past experience in another country — rather than the government's conduct — implicates the Fifth Amendment," as the Fifth Amendment is "not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.* (quoting *Colorado*, 479 U.S. at 170).

[15] For example, defendant points to Special Agent Hoang's question that "[w]hen Nam asked you to meet, to follow a lady, and kidnap her then put her in a vehicle, do you remember that incident, do you remember that event?" Interview Tr. at 17.

"suggestive questioning that provided details of the alleged crime" in holding that a defendant's statement was involuntary. 751 F.3d 1008, 1027–28 (9th Cir. 2014). *Preston* is both inapposite and unpersuasive. In *Preston*, there were a number of other factors the Ninth Circuit relied on that are not present here, including that the defendant there had a "severe intellectual impairment" and the police (i) used "repetitive questioning and [ ] threats that [the questioning] would continue without end," (ii) pressured the defendant to adopt certain answers, (iii) used "alternative questions that assumed [the defendant's] culpability," (iv) engaged in "multiple deceptions about how the statement would be used," and (v) made "false promises of leniency and confidentiality." *Id.* Those circumstances are not present here, and thus *Preston* is inapposite and unpersuasive. As a result, defendant's argument that Special Agent Hoang's suggestive questioning renders all of defendant's statements involuntary fails. *See Mann v. Thalacker*, 246 F.3d 1092, 1100 (8th Cir. 2001) ("[W]e are not persuaded that [defendant] was coerced into dictating and signing a detailed confession simply because he was interrogated on little sleep by an officer who used some leading questions and sometimes prodded him to be more forthcoming.").

The next issue is whether Special Agent Hoang's statements referencing deportation, defendant's family, and a potential prison sentence render a certain incriminating statement inadmissible. Special Agent Hoang raised the prospect of deportation at two separate points during the interview; once at 11:06 p.m., and the second time at 11:12 p.m. When Special Agent Hoang raised the specter of deportation the second time, he also told defendant that defendant was facing a 15-year prison term and that defendant's wife and kids would not love him if defendant were deported. Special Agent Hoang then proceeded to question defendant about his narcotics activities. Approximately 20 minutes later, at 11:31 p.m., defendant admitted to

17

Special Agent Hoang that Nam's girlfriend had called defendant and cried in expressing to defendant how upset she was over Nam's posting sexually explicit photos of her on Facebook. This statement concerning the Facebook photos is the only statement following the deportation references that the government seeks to admit, and accordingly the suppression analysis on this issue is limited to whether this admission was involuntary.

There is no question that the prospect of deportation is significant for criminal defendants. *See Padilla v. Kentucky*, 559 U.S. 356, 365, 368 (2010) (stating that "[w]e have long recognized that deportation is a particularly severe penalty" and that defendants may care more about remaining in the United States than being incarcerated) (internal quotation marks omitted).[16]  Furthermore, courts have recognized that while "misrepresentations of fact are not enough to render a suspect's ensuing confession involuntary . . . [p]olice misrepresentations of law . . . are much more likely to render a suspect's confession involuntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010).  Special Agent Hoang mistakenly raised the prospect of deportation because he did not learn until later in the interview that defendant is an American citizen and cannot be deported.  As a result, the question is whether Special Agent Hoang's mistaken references to deportation, viewed in light of his other comments and all the circumstances of the interview, require suppression of defendant's statement about the Facebook photos.  They do not.

---

[16] *See also United States v. Feliz*, 794 F.3d 123, 132–33 (1st Cir. 2015) (holding that the district court committed plain error where the court excluded from a suppression hearing evidence that a police officer threatened a suspect with the deportation of his mother and state custody of the suspect's children, as the evidence was not hearsay and was "plausible and significant," and remanding the case for a new suppression hearing to determine whether the confession was voluntary).

When assessing whether police conduct renders an admission involuntary, the Fourth

Circuit has emphasized that the "proper inquiry is whether the [admission] was extracted by the

threats or implied promises." *Id.* at 783 (internal quotation marks omitted). The timeline of the

interview shows that defendant did not make his statement about the Facebook photos *because of*

Special Agent Hoang's references to deportation. Defendant made all but one of his

incriminating statements with respect to the stalking, kidnapping, and burglary before Special

Agent Hoang mentioned the subject of deportation. When Special Agent Hoang mentioned the

subject of deportation at 11:06 p.m. and again at 11:12 p.m., defendant said nothing about the

stalking, kidnapping, burglary, or Facebook photos; the conversation was limited to defendant's

alleged narcotics activities. Defendant did not mention the Facebook photos until 11:31 p.m.,

approximately 20 minutes after Special Agent Hoang's comments. This timeline indicates that

the references to deportation did not abruptly pressure defendant to mention the Facebook

photos.[17] Put differently, this 20-minute gap, combined with the incriminating admissions that

preceded the comments regarding deportation, point persuasively to the conclusion that the

admission concerning the Facebook photos was not "extracted by" Special Agent Hoang's

mistaken reference to deportation. *Braxton*, 112 F.3d at 780; *see also United States v. Holmes*,

670 F.3d 586, 592–93 (4th Cir. 2012) ("Numerous cases reiterate that statements by law

enforcement officers that are merely uncomfortable or create a predicament for a defendant are

not ipso facto coercive.") (internal quotation marks omitted).[18]

---

[17] *Compare Grades v. Boles*, 398 F.2d 409, 411–14 (4th Cir. 1968) (holding that a confession
was involuntary because the prosecutor's statement that the prosecutor would not press certain
charges against the defendant, which "immediately" prompted defendant to sign a prepared
confession, amounted to an implied promise that was the "principal and determinative factor
motivating" the defendant to sign the confession).

19

The other circumstances surrounding the interview support this conclusion. As stated above, defendant "was given his *Miranda* rights before he gave" the incriminating statement, he indicated that he understood his rights, and he "signed a form indicating that he understood his rights and that he was waiving them." *United States v. Gray*, 137 F.3d 765, 771 (4th Cir. 1998). Special Agent Hoang mentioned the word "deportation" only three times during the last half hour of a two-hour interview. Significantly, the video recording shows that defendant did not exhibit concern or become agitated when Special Agent Hoang mentioned deportation, but instead remained calm and composed. The video recording further reflects that Special Agent Hoang did not raise his voice or berate defendant; indeed, immediately after Special Agent Hoang mentioned the issue of deportation at 11:12 p.m., Special Agent Hoang told defendant that defendant should eat something and allowed defendant to use the bathroom after defendant requested to do so. Interview Tr. at 138. Despite Special Agent Hoang's references to deportation, defendant's family, and a prison sentence, defendant did not admit to any involvement in narcotics activities, which was the subject of the interview at the time of Special Agent Hoang's comments. This confirms that defendant's will was not overborne by those

---

[18] Defendant relies on the Supreme Court of Colorado's decision in *People v. Ramadon* to argue that Special Agent Hoang's references to deportation rendered his statement involuntary. In that case, the court concluded that an officer's threat to deport the suspect to Iraq rendered the suspect's statements involuntary, given that the suspect was a U.S. military informant who had been brought to the United States from Iraq for his safety after the Iraqi military killed members of his family. 314 P.3d 836, 844 (Colo. 2013). The threat of deportation in that case was a "uniquely terrifying prospect" for the suspect given his own history in Iraq, thus making him vulnerable to such a threat. *Id.* The officer also knew of the suspect's history and deliberately used that information in his interview. *Id.* Those unique circumstances are obviously not present in this case, as Special Agent Hoang mistakenly raised the prospect of deportation and defendant is a naturalized U.S. citizen who has lived here since 2001. Moreover, it is significant to note that the Colorado court noted that "advising a defendant of immigration consequences alone would likely not demonstrate coercion absent other evidence demonstrating involuntariness under the totality of the circumstances." *Id.*

20

comments. *See United States v. Breeden*, 149 F. App'x 197, 202 (4th Cir. 2005) (unpublished) ("The federal agents' misrepresentations did not make [the defendant's] confession involuntary because he repeatedly denied any role in the murder . . . after each of those misrepresentations."). Finally, Special Agent Hoang's references to defendant's family and a potential 15-year prison sentence based on defendant's alleged narcotics crimes do not outweigh the other circumstances indicating that defendant's admission was voluntary. *See United States v. Mitchell*, 514 F. App'x 319, 321–22 (4th Cir. 2013) (unpublished) (concluding that defendant's statements would not be involuntary even if the officers threatened that his refusal to claim responsibility for the crime would prompt "the Department of Social Services [to] take [his girlfriend's] children from [his girlfriend], possibly permanently"); *United States v. Pelton*, 835 F.2d 1067, 1072 (4th Cir. 1987) ("[A] law enforcement officer may properly tell the truth to the accused.").[19]

Although defendant may have felt some intimidation during the course of the interview, the Fourth Circuit has sensibly made clear that "[v]oluntariness is not . . . to be equated with the absolute absence of intimidation, for under this test virtually no statement would be voluntary." *Id.* Instead, the totality of the circumstances shows defendant's will was not overborne by Special Agent Hoang's references to deportation, defendant's family, and a potential prison sentence. As a result, defendant's statement concerning the Facebook photos is admissible. *See Braxton*, 112 F.3d at 781.

---

[19] *See also United States v. Shears*, 762 F.2d 397, 401 (4th Cir. 1985) ("[G]overnment agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary.").

## III.

For the foregoing reasons, defendant's motion to suppress his statements during the

interview is appropriately denied.

An appropriate order has issued.

Alexandria, Virginia
March 2, 2017

/s/

T. S. Ellis, III
United States District Judge